AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
#### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 5:22-MJ-00626 |
| Premises Located at | ) | |
| 152 N. Vecino Drive, | ) | |
| Covina, California 91723 | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846; and 843(b) | See attached affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
*Applicant's signature*

USPIS Task Force Officer, Zachary Sumpter
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Riverside, CA</u>

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Julius Nam (951-276-6942)

## **AFFIDAVIT**

I, Zachary Sumpter, being duly sworn, declare and state as follows:

## I. **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of warrants to search the following:

a.   The premises located at 152 N. Vecino Drive, Covina, California 91723 (hereinafter referred to as "SUBJECT PREMISES 1"), as further described in Attachment A-1.

b.   The premises located at 701 S. Palmetto Ave., Unit D64, Ontario, California 91762 (hereinafter referred to as "SUBJECT PREMISES 2"), as further described in Attachment A-2.

c.   The premises located at 13005 Sycamore Avenue, Unit B, Chino, California 91710 (hereinafter referred to as "SUBJECT PREMISES 3"), as further described in Attachment A-3.

2.   The requested search warrants seek authorization to seize evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute a controlled substance), 21 U.S.C. § 846 (conspiracy and attempt to distribute and possess with intent to distribute controlled substances), and 21 U.S.C. § 843(b) (unlawful use of a communication facility, including the mail, to facilitate the distribution of a controlled substance) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR TASK FORCE OFFICER ZACHARY SUMPTER

4.    I am a Task Force Officer ("TFO") with the United States Postal Inspection Service ("USPIS"), and have been so employed since November 2021.  I am currently assigned as a Task Force Officer to the Contraband Interdiction and Investigations South Team of the Los Angeles Division, which is responsible for investigating drug trafficking violations involving the United States Mail.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.  Prior to being assigned as a TFO with the USPIS, I worked patrol as a full-time sworn law enforcement officer with the Chino Police Department.  I have been a sworn law enforcement officer since August 2013.  I am a Police Officer within the meaning of Section 830.1 of the California Penal Code.  I have received training and have

2

experience investigating violations of state and federal
narcotics and money laundering laws, including, but not limited
to Title 21, United States Code, Sections 841, 846, 952, 959 and
963 and Title 18, United States Code, Section 1956(a).  I have
been involved in various electronic surveillance methods
including state and federal wiretap investigations, the
debriefing of informants and witnesses, as well as others who
have knowledge of the manufacturing, distribution,
transportation, storage, and importation of controlled
substances and the laundering of drug proceeds.

5.    I am familiar with narcotics traffickers' methods of
operation, including the manufacturing, storage, transportation,
and distribution of narcotics, the collection of money that
represents the proceeds of narcotics trafficking, and money
laundering.  I am also familiar with the ways that narcotics
traffickers transport and distribute narcotics in areas they
control.  I am familiar with how drug traffickers use counter-
surveillance techniques to avoid law enforcement detection.  I
also know that drug traffickers often communicate with their
associates through cellular telephones.  I have become aware
that more sophisticated drug trafficking networks now utilize
the dark web, e-mail, Voice over Internet Protocol, video chat,
internet messaging services, and social networking sites to
communicate with one another.  During drug-related
communications, traffickers often use coded or cryptic language
to disguise the drug-related nature of their conversations.

### III. <u>**SUMMARY OF PROBABLE CAUSE**</u>

6.    The USPIS, in conjunction with the Drug Enforcement Administration ("DEA"), Sioux Falls Resident Office ("SFRO"), are investigating a methamphetamine and fentanyl Drug Trafficking Organization ("DTO") that is mailing parcels containing narcotics from California to other locations across the United States, including to South Dakota.

7.    This investigation began on May 11, 2022, when I intercepted a parcel at the United States Postal Service ("USPS"), City of Industry Processing and Distribution Center. Pursuant to a federal search warrant described below, I opened the aforementioned parcel and found to contain fentanyl pills and methamphetamine.  The USPIS initiated an investigation and found that several Los Angeles-based Internet Protocol ("IP") addresses had been tracking the parcel between the months of May and June 2022.  One of those Los Angeles-based IP addresses, ending in a007 whose subscriber address with SUBJECT PREMISES 3, was also found to be tracking additional USPS parcels destined to South Dakota.  Law enforcement did not seize some of the parcels that those IP addresses were tracking, but officers saw that the parcels possessed similar characteristics to the seized parcel and had other characteristics consistent with those that had contained narcotics.

8.    Utilizing information obtained during the investigation of the aforementioned parcels, I identified BRIAN PEREZ ("B. PEREZ") as the mailer.  I determined that B. PEREZ resides at SUBJECT PREMISES 3 at 13005 Sycamore Avenue, Apt. B,

4

Chino, California 91710.  During the investigation, I learned
that B. PEREZ was being investigated by the DEA SFRO as the
source of supply for the target of their investigation in South
Dakota.

    9.    On July 26, 2022, law enforcement identified a second
parcel being shipped to Sioux Falls, South Dakota, and seized
it.  The parcel was opened pursuant to a federal search warrant
described below and was found to contain a large quantity of
fentanyl pills.  The investigation of this parcel led to
CHRISTOPHER PEREZ ("C. PEREZ").  C. PEREZ resides at SUBJECT
PREMISES 1.  USPIS and DEA SFRO executed a controlled delivery
of the parcel and a subsequent search warrant of the recipient's
residence in South Dakota.  An individual later identified as
Christina Verbrugge accepted that parcel in South Dakota.
During a subsequent interview with law enforcement, Verbrugge
provided consent to officers to review text messages on her cell
phone, which Verbrugge exchanged the source of the fentanyl
pills in the parcel.  Verbrugge told law enforcement that the
source was B. PEREZ.

    10.   On March 17, 2022, law enforcement discovered a third
parcel which they believed Verbrugge shipped to SUBJECT PREMISES
1, intending for B. PEREZ to receive it.  The parcel was
accidentally opened in a USPS facility and found to contain
approximately $20,900 in US currency.  Law enforcement believed
that money constituted the proceeds of narcotics sales.  USPS
business records revealed that between August 2021 and March
2022, approximately nine additional parcels, which possessed

similar characteristics as the seized parcel containing $20,900 but were not seized by law enforcement, were sent to SUBJECT PREMISES 1 from South Dakota.

11.  On July 28, 2022, while analyzing USPS business records, law enforcement discovered a fourth parcel associated with the parcel which contained fentanyl and was seized on July 26, 2022.  This fourth parcel originated from South Dakota and was shipped to Pomona, California.  The parcel was opened pursuant to a federal search warrant described below and was found to contain $2,150 in US currency.  The currency was believed to be the proceeds of narcotics sales by B. PEREZ.  A controlled delivery of the fourth parcel was executed at the recipient address, 1058 W. 12th St., Pomona, California 91766.

12.  During surveillance at SUBJECT PREMISES 1, law enforcement observed activity consistent with a location in which drugs are often stashed, specifically multiple random vehicles and subjects came to SUBJECT PREMISES 1 within a short time frame.  One of them was a woman believed to be C. PEREZ'S girlfriend, who arrived in a vehicle registered to C. PEREZ and exited with a large bag and went inside SUBJECT PREMISES 1.

13.  Both C. PEREZ and B. PEREZ have a criminal history with multiple convictions for drug possession and sales while being armed.

14.  SUBJECT PREMISES 2 was discovered to be listed in B. PEREZ's name.  On July 23, 2022, B. PEREZ had been observed at SUBJECT PREMISES 2 via GPS vehicle tracking three days prior to the shipment on July 26, 2022, which was found to contain

fentanyl.  On August 30, 2022, a Chino Police Department drug detection canine gave a positive alert to the exterior of SUBJECT PREMISES 2, indicating the presence of controlled substances or other items that emitted the odor of controlled substances.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>[1]

### A.   Interception of Two Fentanyl Parcels

#### 1.   <u>The First Fentanyl Parcel - Chino, California</u>

15.  On May 11, 2022, I identified and intercepted USPS Priority Mail Express parcel bearing tracking number EI280368361US (hereinafter referred to as the "FENTANYL PARCEL 1") from Chino, California to Sioux Falls, South Dakota while conducting a profiling operation at the City of Industry Processing and Distrubution Center in Los Angeles County. FENTANYL PARCEL 1 was addressed to "Cherylee Aguilar, 2500 Arcadia Rd, Sioux Falls, South Dakota 57105."  The sender/return address was listed as "Johnny Aguilar, 7026 Angora St, Chino CA 91710."  Both sender and recipient addresses were handwritten on the package.  I researched the sender name and address, and the recipient name and address for FENTANYL PARCEL 1 in the CLEAR database.  The CLEAR searches did not show the listed sender name of "Johnny Aguilar" associated with the listed sender address or the listed recipient name of "Cherylee Aguilar" associated with the listed recipient address.

16.  On May 16, 2022, the Honorable Patricia Donahue, United States Magistrate Judge for the Central District of

---

[1] All dates are on or about and all times are approximate.

California, issued a search warrant for FENTANYL PARCEL 1, in case number 2:22-MJ-1942.

17.  On May 17, 2022, I opened FENTANYL PARCEL 1 which contained two USPS Flat Rate Envelopes taped together.  Within the USPS Flat Rate Envelopes were two seperately vacuumed sealed clear bags with a white crystalline substance that presumptively tested (NIK) positive for methamphetamine.  Within one of the vaccummed sealed clear bags containing the methamphetamine there was also approximately 1,000 pills weighing approximately 140 grams of light blue round "M/30" pressed fentanyl pills.  The total weight of the methamphetamine was approximately 1,364 grams.  The methamphetamine, fentanyl, and drug wrappings were sent to the USPIS Forensic Lab for chemistry and latent print analysis.

18.  On May 17, 2022, upon reviewing USPS records, I learned that FENTANYL PARCEL 1 was mailed on May 10, 2022, at 4:37 p.m. at the Chino Post Office, 5373 Walnut Avenue, Chino, California.  I obtained and reviewed surveillance video footage from the Chino Post Office of the mailer, later identified as B. PEREZ.  The mailer was seen exiting the Post Office and entering what appeared to be a white Chevrolet Traverse.

19.  Based on my review of USPS records, I learned that there was an IP address ending in 7.15, which was tracking FENTANYL PARCEL 1.  I learned that the IP address was also tracking another parcel destined to South Dakota.  That parcel was USPS Priority Mail Express parcel (hereinafter referred to as the "IVY ROAD PARCEL 1") bearing tracking number

EI380855565US from Upland, California to Tea, South Dakota.  The
IVY ROAD PARCEL 1 was addressed to "112 E Ivy Rd., Tea, South
Dakota 57064," and was delivered on June 25, 2022.  It was not
intercepted by law enforcement.  The IVY ROAD PARCEL 1 was
mailed on June 23, 2022, at about 11:02 a.m. at the Upland Post
Office, 333 E. Arrow Highway, Upland, California.  I obtained
and reviewed surveillance video footage of the mailer who
strongly resembled the individual who mailed FENTANYL PARCEL 1.
The mailer exited the post office at approximately 11:06 a.m.
and entered a white Chevrolet Traverse with California license
plate 8GVJ605 (hereinafter referred to as VEHICLE 1).  I then
observed VEHICLE 1 exiting the post office parking lot.

20.  Upon reviewing law enforcement databases, I learned
that VEHICLE 1 is registered to "Brian Perez" with a birth date
of 02/28/1995, residing at SUBJECT PREMISES 3.  Based on a
review of B. PEREZ's California Department of Motor Vehicles
("DMV") Driver's License photo, I determined that he strongly
resembles the individual who had mailed both FENTANYL PARCEL 1
and IVY ROAD PARCEL 1.

21.  While checking law enforcement databases for any
conflicts with other agencies, I learned that DEA SFRO had an
investigative interest in B. PEREZ in connection with an
unrelated narcotics investigation.  Based on my conversations
with SA B. Purcell of DEA SFRO, I am aware of the following:
While investigating a DTO in South Dakota, investigators learned
that Christina Verbrugee made contact on July 4, 2022, with B.
PEREZ via telephone.  Investigators believed B. PEREZ was the

source of supply of narcotics involved in that investigation
from California.

22.   Upon further research of USPS business records, I
identified an IP address ending with a007, associated with
online customer tracking inquiries related to FENTANYL PARCEL 1.
This specific IP address was assigned to the internet service
provider ("ISP") Charter Communications and geolocated to Chino,
California.  I requested subscriber information associated with
the IP address to Charter Communications.

23.   In response to my request, Charter Communications
provided a service address of 13005 Sycamore Avenue, Apt. B,
Chino, CA 91710 (SUBJECT PREMISES 3) as well as subscriber
information indicating the account was registered in the name
"Annabelle Espinoza," with a phone number of (909) 766-5738.  A
check of law enforcement databases revealed that Anabel Espinoza
is associated to SUBJECT PREMISES 3 and believed to be B.
PEREZ's mother-in-law.

24.   Based on a review of USPS records, I learned that
there was an IP address ending with ad2, which was tracking
FENTANYL PARCEL 1.  I learned that it was also tracking another
parcel destined to South Dakota.  That other parcel was USPS
Priority Mail Express parcel (hereinafter referred to as the
"IVY ROAD PARCEL 2"), bearing tracking number EI229060845US from
Ontario, California to Tea, South Dakota.  The IVY ROAD PARCEL 2
was addressed to "112 E Ivy Rd., Tea, South Dakota 57064."  It
was not intercepted by law enforcement.  The IVY ROAD PARCEL 2
was mailed on June 8, 2022, at about 11:13 a.m. at the Ontario

Post Office, 1126 N. Mountain Ave, Ontario, California 91762.  I obtained and reviewed surveillance video footage of the mailer who strongly resembled B. PEREZ.  He arrived in an older model, red four-door sedan with aftermarket chrome wheels.  I authored a GPS tracker warrant for VEHICLE 1 which was granted by the Honorable Jerry Johnson of the Superior Court of California, County of San Bernardino, case number 000090856.  On July 14, 2022, investigators located VEHICLE 1 at B. PEREZ'S residence, 13005 Sycamore Avenue, Apt. B, Chino, California (SUBJECT PREMISES 3) and installed a GPS tracker.  On July 14, 2022, I observed a red Mitsubishi Galant bearing California license plate 7SKY502 (hereinafter referred to as VEHICLE 2) with chrome aftermarket wheels that was parked in a parking stall directly next to SUBJECT PREMISES 3.  VEHICLE 2 resembled the same vehicle that the person strongly resembling B. PEREZ drove during the mailing of IVY ROAD PARCEL 2.  A records check revealed the registered owner of VEHICLE 2 as B. PEREZ with an address of SUBJECT PREMISES 3.  I authored a second GPS tracker warrant for VEHICLE 2 which was granted by the Honorable James Hosking, Superior Court of California, County of San Bernardino, case number 000091475.  On July 22, 2022, a GPS tracker was installed on VEHICLE 2.

      2.   <u>The Second Fentanyl Parcel - Covina, California</u>

    25.  On July 26, 2022, I intercepted USPS Priority Mail Express parcel bearing tracking number EI032799763US (hereinafter referred to as "FENTANYL PARCEL 2") mailed from Covina, California and addressed to Sioux Falls, South Dakota

while conducting a profiling operation at the City of Industry
Processing and Distrubution Center.  FENTANYL PARCEL 2 was
addressed to "Sandi P., 304 N. Indiana Ave, Sioux Falls, South
Dakota 57105."  The sender/return address was listed as "Mike I,
363 E. Italia St., Covina CA 91723."  I researched the sender
name and address and the recipient name and address for FENTANYL
PARCEL 2 in the CLEAR database.  The CLEAR searches did not show
"Mike I" (or its variations) associated with the listed sender
address or "Sandi P." (or its variations) associated with the
listed recipient address.

26.  I recognized that the recipient address was located in
close proximity to another address identified in this
investigation at "522 N. Indiana Ave, Sioux Falls, South
Dakota."  Based on conversations with DEA SA B. Purcell, I
learned that the recipient address of FENTANYL PARCEL 2, 304 N.
Indiana Ave., Sioux Falls, South Dakota, is associated to James
and Christian Verbrugee who have been identified as narcotic
trafficking suspects operating within a DTO in South Dakota.

27.  Based on my examination of the exterior of FENTANYL
PARCEL 2, I observed that it shared characteristics with
FENTANYL PARCEL 1 and those common to parcels that contain
contraband, specifically:

a.   FENTANYL PARCEL 2 was mailed using Priority
Express Mail service with no business account number;

b.   FENTANYL PARCEL 2's sender and recipient
information were handwritten.

c.    FENTANYL PARCEL 1 and 2 were both mailed in a similar medium-size USPS mailing box.

d.    The narcotics contained in FENTANLY PARCEL 1 and 2 were both packaged similar in heat sealed bags.

28.    On July 27, 2022, the Honorable Alicia G. Rosenberg, United States Magistrate Judge for the Central District of California, issued a search warrant for FENTANYL PARCEL 2, in case number 2:22-MJ-2919.

29.    On July 27, 2022, pursuant to the search warrant, I opened FENTANYL PARCEL 2 which contained a white USPS bubble envelope as packaging and another white bubble envelope.  Within the white bubble envelope was a black and clear plastic heat-sealed package containing another clear and black plastic bag containing a large amount or approximately 463 grams of light blue round pills "M/30" pressed fentanyl.  The fentanyl and drug wrappings were then sent to the USPIS Forensic Lab for chemistry and latent print analysis.

30.    Upon reviewing USPS records, I learned that FENTANYL PARCEL 2 was mailed on July 26, 2022, at 12:04 p.m., at the Covina Post Office, 170 E. College St., Covina, California.  I obtained and reviewed surveillance video footage from the Covina Post Office of the mailer, who had similar features as B. PEREZ but appeared younger.  Upon conducting law enforcement records searches, I located C. PEREZ associated with 152 N. Vecino Drive, Covina, California 91723 (SUBJECT PREMISES 1) and is B. PEREZ's sibling.  After reviewing the California DMV driver's license photo of C. PEREZ, I observed that he strongly resembled

13

the individual who mailed FENTANYL PARCEL 2.  Furthermore, FENTANLY PARCEL 2 was mailed from the Covina Post Office, which is approximately 0.8 miles away from SUBJECT PREMISES 1.

31.  On July 23, 2022, at approximately 10:40 a.m., while monitoring GPS tracking, I observed, through the digital data sent via GPS tracking, that VEHICLE 1 arrive at the premises of a self-storage company called Trojan Storage of West Ontario where SUBJECT PREMISES 2 (Unit D64) is located.  At approximately 10:50 a.m., VEHICLE 1 left SUBJECT PREMISES 2.

32.  On July 25, 2022, at approximately 5:25 p.m., while monitoring GPS tracking, I observed, through the digital data sent via GPS tracking, that VEHICLE 2 drove to SUBJECT PREMISES 1.

33.  Based on the facts that (a) on July 23, 2022 (three days before the mailing of FENTANYL PARCEL 2 on July 26, 2022), VEHICLE 1 went to SUBJECT PREMISES 2, and (b) on July 25, 2022 (one day before the mailing of FENTANYL PARCEL 2), VEHICLE 2 drove to SUBJECT PREMISES 1, I believe both SUBJECT PREMISES 1 and SUBJECT PREMISES 2 are locations where drugs are stashed.

**B.   Controlled Delivery of FENTANYL PARCEL 2**

34.  On July 27, 2022, I referred FENTANYL PARCEL 2 to United States Postal Inspector ("USPI") B. Smith of the Sioux Falls Narcotics Investigation Team.  On July 28, 2022, the Honorable Veronica Duffy, United States Magistrate Judge for the District of South Dakota, issued a search warrant in case number 4:22-MJ-88, for the recipient address of FENTANYL PARCEL 2 – 304 N. Indiana Ave., Sioux Falls, South Dakota.  On July 29, 2022,

USPI B. Smith in conjunction with DEA SFRO executed a controlled delivery of FENTANYL PARCEL 2, which was accepted by Christina Verbrugee.  Thereafter, the residence at that address was searched pursuant to the federal search warrant and Verbrugee was taken into custody for questioning.

35.  Based on conversations with DEA SA B. Purcell who spoke with officers who conducted the search of the 304 N. Indiana Ave. address and interviewed Verbrugee, as well as my own review of DEA SFRO reports and records from this investigation, I am aware of the following:

a.  During the search warrant execution of the 304 N. Indiana Ave. address on July 29, 2022, agents located a notebook which contained the following information handwritten in the notebook: "Brian Alexander Perez, Covina, CA, 626-498-4378."  I know that B. PEREZ's California DMV driver's license has "152 N. Vecino Dr., Covina, CA 91723" (SUBJECT PREMISES 1) listed and he uses telephone number (626)498-4378.

b.  Christina Verbrugee told agents that B. PEREZ trusted her with receiving and paying for drug-laden packages.

c.  Verbrugee admitted to ordering M30 pills and methamphetamine from B. PEREZ.

d.  Verbrugee stated that one pound of methamphetamine cost "Anywhere from 35 to 45, sometimes 55" (which, based on my training and experience in narcotics investigations, I understand to mean $3,500, $4,500, and $5,500, respectively).

     e.   Verbrugee told agents she had B. PEREZ's phone number saved in her cell phone under "Brian Cousins." Verbrugee then gave agents consent to review her cell phone.

     f.   Upon review of Verbrugee's cell phone, agents saw that the following text messages were exchanged between Verbrugee and "Brian Cousins" from July 27, 2022, to July 29, 2022:

**JULY 27, 2022:**

**"Brian Cousins"** – "I need to know if you going to get that out today or not?"

**Verbrugee** – "What one the one for delivery today" "I did cause it wasn't here"

**"Brian Cousins"** – "No no worries" "It says next day but it's usually always 2"

**July 28, 2022:**

**Verbrugee** – "Anything"

**"Brian Cousins"** – "He's running late"

**Verbrugee** – "Any word on mail cause my son didn't now you said no track and he tracked no changes. Not good man"


"Brian Cousins" then sent a screenshot of the tracking information from the USPS website via text message. The screenshot contained the following information:

       <u>July 26, 2022, 12:04 PM</u>

       USPS in possession of item, COVINA CA 91723

       <u>July 26, 2022, 6:00 PM</u>

       Arrived at USPS Origin Facility, COVINA, CA 91723

<u>July 27, 2022, 11:00 AM</u>

Arrived at Post Office, CITY OF INDUSTRY, CA
91715

<u>July 27, 2022, 5:00 PM</u>

Arrived at USPS Regional Origin Facility, CITY OF
INDSUTRY CA DISTRIBUTION CENTER. THE item is
currently in transit to the destination.

**"Brian Cousins"** – "It's moving just slow"

**Verbrugee** – Did you get $ can you senf today"

**"Brian Cousins"** – "I haven't even tracked and my runner
hasn't hmu so most likely getting here tomorrow" "Slow down
cowgirl let these get to their destination first"

**"Brian Cousins"** – "You good?"

**Verbrugee** – "No… I need work asap people blowing me up"

**"Brian Cousins"** – "Your killing me smalls", "We're those
for your boy?", "You got them tho right?"

**Verbrugee** - "Yes sir do now", "What is the balance for this
package"

**"Brian Cousins"** - "16 big ones",[2] "Also I need a forsure dat
on that no if ands or buts lmk how the weekend goes and
give me a date on Monday."

    g.   Agents also found on Verbrugee's phone a photo of
a USPS receipt dated July 27, 2022, from Vermillion, South
Dakota.  The receipt contained the following information:

---

[22] Based on my training and experience in narcotics
investigations, I understand "16 big ones" to mean $16,000.

PM Express 1-Day - $26.95

To: Pomona, CA 91766

Delivery date: July 28, 2022, 6:00 PM

Tracking: #EJ846248586US

36.   Based on the text messages found on Verbrugee's cell phone, I believe B. PEREZ was asking Verbrugee if she would be able to send him money to pay for the drug-laden package that C. PEREZ ("B. PEREZ's runner") had sent from the Covina Post Office to Verbrugee on July 26, 2022.

**C.   Third Parcel Containing Proceeds of Narcotics Sales Shipped to SUBJECT PREMISES 1**

37.   Upon reviewing USPS records, I learned that on March 9, 2022, USPS Priority Mail Express parcel bearing tracking number EI010009772US (hereinafter referred to as "PARCEL 772") mailed from Valley Springs, South Dakota, and sent to Covina, California, was seized by USPI R. Alvarez.   PARCEL 772 was addressed to "Mary Nabaro, 152 N. Vecino Dr, Covina, California 91723" (SUBJECT PREMISES 1), and the sender/return address was listed as "Christina Mistretta, 300 BoxElder st Valley Springs 57068."   Based on my conversations with USPI R. Alvarez, and my review of his reports and records, I am aware of the following:

a.   PARCEL 772 accidentally broke open on the workroom floor of the City of Industry Processing and Distribution Center located at 15421 E. Gale Ave., City of Industry, CA 91715.

b.   PARCEL 772 was taken into custody by USPS supervisors.   The supervisors observed that PARCEL 772 contained

US currency.  The US currency was counted thereafter by USPS employees and found to amount to $20,900 in US currency.  PARCEL 772 and its contents were secured.  USPI R. Alvarez was notified of PARCEL 772's existence and its content for further investigation.

38.  Based on my conversations with DEA SA B. Purcell, the sender's name, "Christina Mistretta," listed on PARCEL 772 is a known alias of Christina Verbrugge from previous investigations involving Verbrugee.

39.  On July 29, 2022, during a subsequent interview, Verbrugge was questioned by DEA agents regarding the parcel containing $20,900 that agents believed she mailed out of South Dakota to California.  Verbrugge acknowledged that she had sent the package with the money because she owed "him."  Verbrugge told agents that she called the post office to inquire about her package, but never received the money back.  Verbrugge further stated that once that package went missing, she "stopped for a long time and did not do anything" (which I understand to mean Verbrugge stopping any drug-related activities).

**D.  Fourth Parcel Containing Proceeds of Narcotics Sales and Controlled Delivery**

40.  On July 29, 2022, based on a review of USPS business records, I concluded that the same IP address ending with 66b, which was being used to track FENTANYL PARCEL 2 was also tracking USPS Priority Mail Express parcel bearing tracking number EJ846248586US (hereinafter referred to as the "PARCEL 586") from Brandon, South Dakota to Pomona, California.  PARCEL

19

586 was addressed to "Steven Munoz, 1058 W. 12th St, Pomona, CA 91766."  PARCEL 586 was mailed on July 27, 2022, at about 12:58 p.m. at the Vermillon Post Office, 16 Court Street, Vermillion, South Dakota 57069.  The sender/return address was listed as "Ashley gonzalez, 25962 478 Ave, Brandon, SD 57005."  Both the sender and recipient addresses were handwritten on the package. I researched the sender name and address and the recipient name and address for PARCEL 586 in the CLEAR database.  The CLEAR searches did not show the listed sender name of "Steven Munoz" associated with the listed sender address or the listed recipient name of "Ashley gonzalez" associated with the listed recipient address.

41.  On July 29, 2022, I interdicted the PARCEL 586 from the Pomona Post Office, 580 W. Monterey Ave., Pomona, California.

42.  On August 1, 2022, the Honorable Steve Kim, United States Magistrate Judge for the Central District of California, issued a search warrant for PARCEL 586, in case number 2:22-MJ-2959.

43.  On August 1, 2022, I opened PARCEL 586, which contained a tie dye hat and a silver and pink coin pouch. Within the hat was a small sealed manila envelope containing four rubber-banded bundles of US currency.  Within the coin pouch was one rubber-banded bundle of US currency.  The total amount was approximately $2,150 in US currency.  The contents were repackaged and placed back into the PARCEL 586.

44.  On August 2, 2022, Chino Police Department
investigators and I executed a controlled delivery of PARCEL 586
at the recipient address, 1058 W. 12th St., Pomona, California.
At approximately 11:19 a.m. that day, I posed as a mail carrier,
in an undercover capacity, to deliver PARCEL 586.  I knocked on
the front door and an unidentified female answered.  I explained
to her that I had a package for Steven Munoz to sign for.  She
replied, "Steven is in jail right now."  The female signed for
PARCEL 586 and took possession of it.

45.  During the aforementioned consent search of Christina
Verbrugge's cell phone, DEA SFRO agents recovered a photo of a
USPS receipt dated July 27, 2022, sent from Vermillion, South
Dakota to Pomona, California with the same tracking number,
#EJ846248586US as PARCEL 586.  I utilized Google maps which
revealed Vermillion, South Dakota is approximately 75 miles away
from Brandon, South Dakota.  I know that drug traffickers will
often mail from postal facilities other than those which are
located in their respective ZIP code to further disguise
themselves as being associated with the parcel.

46.  On August 2, 2022, at approximately 11:28 p.m. while
monitoring GPS tracking, I observed, through the digital data
sent via GPS tracking VEHICLE 2 was one block away (1300 block
of Grand Avenue, Pomona, California) from 1058 W. 12th St.,
Pomona, California (approximately 0.6 miles).  Based on my
training and experience, and knowledge of this investigation in
which B. PEREZ was the only person who has been observed to
drive VEHICLE 2, I believe B. PEREZ was picking up the proceeds

of narcotics sales from PARCEL 586, which had been delivered
that same day at 1058 W. 12th St., Pomona, California.

**E.    Investigation of B. PEREZ and C. PEREZ and SUBJECT
PREMISES 1**

47.   On August 16, 2022, Chino Police Department
investigators and I conducted surveillance at SUBJECT PREMISES
3.  At approximately 4:00 p.m., B. PEREZ arrived driving VEHICLE
2.  Shortly thereafter, he entered VEHICLE 1 with a Hispanic
female adult and two children.  B. PEREZ drove to SUBJECT
PREMISES 1 where he was seen walking toward Unit 152. SUBJECT
PREMISES 1 is in a multi-family development complex and there
are limited locations for law enforcement to perform
surveillance due to the remote nature of the location, few to no
parking spots available on the narrow street and limited foliage
or structures to provide cover or concealment.  I know the
following information from my own observations:

a.   At approximately 6:00 p.m., a gray Dodge Charger
(California license plate 8TUF794) registered to C. PEREZ
arrived at parked in the middle of the street in front of
SUBJECT PREMISES 1.  A Hispanic female adult with long black
hair exited the driver seat.  The female removed an unknown item
from the back seat and walked to SUBJECT PREMISES 1.  She
returned to the vehicle and removed a large duffle bag from the
back seat and walked to SUBJECT PREMISES 1.  The female did not
return to the gray Dodge Charger although flashing hazard lights
were left on;

b.   At approximately 6:08 p.m., I saw B. PEREZ walking to the front of SUBJECT PREMISES 1.  Shortly thereafter, a male walked up to B. PEREZ on foot.  While they were talking, B. PEREZ appeared to be showing something on his cell phone to the male.  Part of my view was obstructed by vehicles parked on the street, which prevented me from making additional observations of the two individuals' interactions.  I then saw the male walk away;

c.   At approximately 6:09 p.m., an adult male arrived in a white van carrying a black backpack and walked to SUBJECT PREMISES 1;

d.   At approximately 7:04 p.m. a dark gray Dodge Charger (California license plate 8YTT710) registered to C. PEREZ arrived and parked in the middle of the street in front of the gray Dodge Charger (California license plate 8TUF794) that arrived earlier.  A male whom I identified as C. PEREZ exited the driver seat.  C. PEREZ walked quickly to SUBJECT PREMISES 1.  C. PEREZ walked back and forth from his vehicle to SUBJECT PREMISES 1 several times;

e.   At approximately 7:19 p.m., I saw B. PEREZ, a Hispanic female, and two children leaving SUBJECT PREMISES 1 and entering VEHICLE 1.  Other members of the the surveillance team observed B. PEREZ drive to Chino at which point the surveillance was terminated;

f.   According to law enforcement databases, SUBJECT PREMISES 1 shows as C. PEREZ's primary address.  The two Dodge

Chargers are registered to C. PEREZ at the address listed as SUBJECT PREMISES 1.

48.   I ran C. PEREZ's criminal history and discovered that he sustained a felony conviction on December 23, 2020 for Possession of Controlled Substance for Sale" (Cal. Health & Safety Code ("HS") 11378), Participation in Criminal Street Gang (Cal. Penal Code ("PC") 186.22(a)), and Conspiracy to Commit Felony: Gang Member (PC 182.5).

49.   On August 01, 2022, I ran B. PEREZ's criminal history and discovered that he sustained a felony conviction on January 13, 2014 for Possession of Controlled Substance for Sale While Armed (HS 11370.1(A)) and Possession of Controlled Substance for Sale (HS 11378).

**F.   Investigation and Police Canine Drug Detection of SUBJECT PREMISES 2**

50.   On August 11, 2022, I went to Trojan Storage of West Ontario where SUBJECT PREMISES 2 (Unit D64) is located and met with the front desk employee of Trojan Storage who allowed me to review video surveillance.  I reviewed the video surveillance footage and observed the following information:

a.   On July 23, 2022, at approximately 10:40 a.m. (as the same time that GPS tracking on VEHICLE 1 showed), VEHICLE 1 entered a gate code to Trojan Storage and entered the grounds of Trojan Storage.

b.   I was unable to identify from the video footage who was driving VEHICLE 1.

c.   VEHICLE 1 drove toward the south portion of the complex and parked near storage unit numbers beginning with the letter "D."  But VEHICLE 1 then was out of sight.

d.   The employee showing me the footage told me that the camera on the southside of the Trojan Storage grounds was not working on July 23, 2022.

e.   The employee was able to lookup account information based on when the keycode was entered at approximately 10:40 a.m.  The information showed "Brian Perez, Unit D64" with keycode "1501."

f.   The employee then provided me with the rental agreement for Unit D64.

g.   Upon reviewing the agreement, I saw that Unit D64 was registered to B. PEREZ as of October 30, 2021, with the address of SUBJECT PREMISES 1 provided.  Attached to the rental agreement was a copy of B. PEREZ's California DMV driver's license.

51.  On August 30, 2022, Chino Police Department Corporal Brendan Rowland and his narcotics-detection canine, "Kobra" conducted an exterior examination of SUBJECT PREMISES 2 (Unit D64).  Officer Rowland informed me that Kobra gave a positive alert to SUBJECT PREMISES 2, indicating the presence of controlled substances or other items that emitted the odor of controlled substances, in SUBJECT PREMISES 2.  Attached hereto as Exhibit 1, which I incorporate fully herein by reference, is a document setting forth information provided by Officer Rowland regarding Kobra's training and history in detecting controlled

substances, as well as Kobra's alert provided during the investigation of SUBJECT PREMISES 2.

52.  As detailed above, based on my training and experience and knowledge of this investigation, I believe that B. PEREZ and C. PEREZ are working together as drug distributors and SUBJECT PREMISES 1, 2, and 3 are illegal drug stash locations that B. PEREZ and C. PEREZ use in furtherance of their drug distribution activities.  Given my investigation so far, I believe it is probable that there is evidence, contraband, fruits, and instrumentalities of the Subject Offenses inside SUBJECT PREMISES 1, 2, and 3, which may include records, digital devices, packaging material, drug proceeds, and controlled substances, etc.

## V.  **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

53.  Based on my training and experience, including my familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the

26

manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices, and in their homes, cars, garages, and storage units.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones or other digital devices, of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles in the event of an unexpected opportunity to sell drugs arises.

e.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

f.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence

27

or in safes.  They also often keep other items related to their drug trafficking activities at their residence, garage, car, and storage units, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

g.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, and at their homes, cars, garages, and storage units.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[3]

54. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

_____

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

     c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   55.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

56.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress thumb and/or fingers, onto the fingerprint sensor of the device (only when the device has such a sensor), belonging to B. PEREZ, C. PEREZ, or any other person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant on the device(s), and direct which specific finger(s) and/or thumb(s) shall be depressed of; and (2) hold the device(s) in front of the person's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature, in order to gain access to the contents of any such device.

57.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

58.   For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B, which constitute evidence, contraband, fruits, or instrumentalities of the Subject Offenses, will be found in a search of SUBJECT PREMISES 1, SUBJECT PREMISES 2, and SUBJECT PREMISES 3 described in Attachments A-1, A-2, and A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
September 2022.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**LOCATION TO BE SEARCHED**

The residence located at 152 N. Vecino Drive, Covina, California 91723 (SUBJECT PREMISES 1).  SUBJECT PREMISES 1 is near the intersection of E. Kenoak Drive and N. Grandview Avenue in Covina.  SUBJECT PREMISES 1 is one of the four units that make up a two-story multi-family quadplex with gray stucco exterior.  Units 154, 156, and 158 are the other three units in the same quadriplex structure, and are not part of SUBJECT PREMISES 1. The front door of SUBJECT PREMISES 1 faces south and is on the first floor.  The number "152" is painted black on a white background located on the front west side of the structure above the window to the left of staircase.  SUBJECT PREMISES 1 includes any vehicles registered to CHRISTOPHER PEREZ or BRIAN PEREZ parked on the street near SUBJECT PREMISES 1.  SUBJECT PREMISES 1 includes any small structures attached or detached on the property showing a connection to 152.



**ATTACHMENT A-2**

**LOCATION TO BE SEARCHED**

The storage unit located at 701 S. Palmetto Avenue, Unit D64, Ontario, California 91762, within the premises of a business called "Trojan Storage of West Ontario" (SUBJECT PREMISES 2).  Trojan Storage of West Ontario is near the intersection of S. Palmetto Avenue and W. Mission Blvd. in Ontario.  Trojan Storage of West Ontario is a single-story storage unit complex comprised of white cinderblocks with a white metal roof.  SUBJECT PREMISES 2 (Unit D64) is accessed through an unlocked rollup door which leads to a hallway of single small individual storage units.  The rollup door of SUBJECT PREMISES 2 faces north and is painted blue.  The number "D64" is in white letters on a red background located above the blue rollup door of SUBJECT PREMISES 2.



ii

**ATTACHMENT A-3**

**LOCATION TO BE SEARCHED**

The residence located at 13005 Sycamore Avenue, Unit B, Chino, California 91710 (SUBJECT PREMISES 3). SUBJECT PREMISES 3 is near the intersection of C Street and Oaks Avenue in Chino. SUBJECT PREMISES 3 is a single-story multi-family duplex with a gray stucco exterior. Unit A of this duplex is not part of SUBJECT PREMISES 3. The front door of SUBJECT PREMISES 3 faces south and has a white metal security door. The number "13005" is painted white on a black background located on the west curb. SUBJECT PREMISES 3 includes any vehicles registered to BRIAN PEREZ or CHRISTOPHER PEREZ parked on the street near SUBJECT PREMISES 3.



## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), (distribution and possession with intent to distribute a controlled substance), 846 (conspiracy and attempt to distribute and possess with intent to distribute controlled substances), and 843(b) (unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance) (the "Subject Offenses"), namely:

a.   Any controlled substances, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the distributing, manufacturing, packaging, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, heat-sealing devices, vacuum-sealing devices, balloons, packaging materials, containers, sodium sulfate, and wrapping material;

c.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

transferring money over $1,000, such as bank account records and accounts;

d.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   U.S. Mail, Express Mail, Priority Mail, United Parcel Service, Federal Express, or other private shipping service's delivery confirmation slips, labels, and associated boxes (to include any packages and envelopes delivered while the search is being conducted);

f.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

g.   Records, documents, programs, applications and materials, or evidence that show the identity of the person(s) controlling, occupying, possessing, residing in, or owning SUBJECT PREMISES 1, 2, and 3 (including rental agreements,

leases, rent receipts, deeds, escrow documents, utility bills, and other mailed envelopes reflecting the address and addressee);

      h.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      i.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

      j.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

      k.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

      l.   Contents of any calendar or date book;

m.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of

ix

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

x

within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, with respect to BRIAN PEREZ, CHRISTOPHER PEREZ, or any other person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement

may not use excessive force, as defined in <u>Graham v. Connor</u>, 490
U.S. 386 (1989); specifically, law enforcement may use no more
than objectively reasonable force in light of the facts and
circumstances confronting them.

  7. The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.